IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE CO. and CHARTER OAK INSURANCE CO., | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 06-0248 CV-W-NKL |
| BUILDING CONSTRUCTION ENTERPRISES, INC., | )<br>)<br>)<br>) |
| Defendants and Third-Party Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| NORTH RIVER INSURANCE CO. and GREAT AMERICAN ALLIANCE INSURANCE CO. | )<br>)<br>)<br>) |
| Third-Party Defendants | ) |

ORDER

Plaintiffs St. Paul Fire and Machine Insurance Company and Charter Oak Insurance Company ("St. Paul" and "Charter" or collectively "Plaintiffs") bring this declaratory judgment action against Defendant Building Construction Enterprises, Inc., ("BCE") to determine their obligations under two policies issued to BCE for the costs of repairing substandard work performed by BCE's subcontractors. Pending before the Court is Plaintiffs' Motion for Summary Judgment [Doc. # 38] and BCE's Cross-Motion

1

for Partial Summary Judgment [Doc. # 48]. For the reasons set forth below, Plaintiffs' Motion is granted and BCE's denied.

## I. Factual Background

In 2003, BCE contracted with the Army Corps of Engineers to construct a training facility at Fort Riley, Kansas. The facility was designed with underground support structures capable of withstanding the weight of military tanks, and repeated short- and long-range arms fire in the vicinity. Specifically, the electrical, communication, and data cables on-site were run through a pattern of PVC conduit encased in concrete ten feet underground called "duct banks."[1]

Construction of the duct banks was carried out entirely by BCE's subcontractors in May and June 2005. The Corps of Engineers noted deficiencies in the duct banks in a June 23, 2005 performance evaluation. BCE undertook repairs of the work in July and subsequently learned of additional problems. On September 9, 2005, the Corps documented a list of eleven deficiencies in the duct bank and demanded that BCE "provide a revised plan [by] September 16, 2005 for correcting those deficiencies." BCE undertook the repairs shortly thereafter.

By letter dated December 15, 2005, BCE made a claim under two policies issued by St. Paul and Charter for "significant expenses in repairing and replacing the property that was damaged by the subcontractors." Plaintiffs inquired by email on January 26, 2006, whether BCE claimed any damage under the policy outside of the work it had

---

[1]Originally, BCE also claimed damages related to one of the buildings on the base called "Building M" but has since limited its claim to the duct banks.

2

contracted for with the Army. BCE replied that it also sought coverage for "the required reseeding of several acres of tall-grass prairie destroyed as a result of the required re-excavation of the duct bank and replacement of backfill," and for "several roadways [that] were, or must be, destroyed and rebuilt as a direct result of the required rework."

The two commercial general liability policies against which BCE made its claims both cover certain "property damage" claims. The policy issued by St. Paul covers property damage caused by an "event" while the policy delivered by Charter covers property damage caused by an "occurrence." Both policies define "event" and "occurrence" respectively as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." An insurance agency called the Lockton Companies, Inc., also located in Kansas City, Missouri., delivered both policies to BCE's principal place of business in Kansas City, Missouri.

## II.     Controlling Law

As a threshold–and perhaps dispositive–issue, the Court must determine whether the substantive law of Missouri or Kansas controls this dispute. In diversity cases, a district court applies the choice-of-law rules of its forum state. *Allianz Ins. Co. of Can. v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006). In insurance contract disputes, Missouri follows Sections 188 and 193 of the Restatement (Second) of Conflict of Laws. *Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d 723, 724-725 (Mo. 2004). Section 188, which applies to policies with no choice-of-laws clause, provides that the law of the state with the most significant relationship to the transaction and parties governs. *Viacom*, 138

S.W.3d at 725. Under the Restatement approach, courts consider the following contacts in determining which state has the most significant relationship: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws section 188(2); *Viacom*, 138 S.W.3d at 725.

Plaintiffs assert that the Missouri law controls this dispute because BCE, though incorporated in Kansas, has its principal place of business in Missouri and Plaintiffs delivered the policies in Missouri. *See Viacom*, 138 S.W.3d at 725 (holding that Pennsylvania law controlled because the insured was based in Pennsylvania and the polices were delivered to its insurance department in that state). BCE initially agreed with Plaintiffs, alleging in its Counterclaim that, "[t]he insurance policies implicated herein were issued and delivered in the state of Missouri and, thereby, Missouri law applies to all disputes described in this counterclaim." Ans. ¶ 48. However, BCE has since distanced itself from its earlier position, claiming for the first time at the summary judgment stage that Kansas law actually controls because the insured risk was in Kansas. *See Egnatic v. Nguyen*, 113 S.W.3d 659, 665 (Mo. Ct. App. 2003) ("the principal location of the insured risk is given greater weight than any other single contact in determining the state of applicable law provided that the risk can be located in a particular state") (quoting Restatement (Second) of Conflict of Laws section 193). The parties dispute whether BCE's choice of laws statement in its Counterclaim is a binding judicial admission, but

4

the Court need not decide that issue because the substantive law of Missouri clearly controls this dispute even without the admission.[2]

Considering the five factors enumerated in Section 188, Missouri has the most significant contacts with this dispute. The insurance policies at issue were delivered to BCE's offices in Missouri. The policies were negotiated between BCE and an insurance agent, the Lockton Companies, Inc., in Kansas City, Missouri. The parties are domiciled in Missouri (BCE's principal place of business), Kansas (BCE's state of incorporation), Minnesota (St. Paul's domicile) and Connecticut (Charter Oak's domicile). The remaining factors, place of performance and location of the subject matter, also favor Missouri but require more explanation.

Because the dispute in the present case involves coverage for work performed by BCE or its subcontractors in Kansas, BCE argues that Kansas is the location of the subject matter. Consequently, BCE claims that Section 193 of the Restatement militates in favor of Kansas law since that is the place of the insured risk. But BCE's argument misapprehends the scope and purpose of Section 193, which provides,

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy . . . .

Restatement (Second) of Conflict of Laws section 193. Section 193 applies to insurance contracts in which it is

---

[2] Accordingly, Plaintiffs' pending Motion for Leave to File Surreply [Doc. # 59] on the judicial admissions issue is denied as moot.

5

> possible to predict with fair accuracy where the risk will be located, or at least principally located, during the life of the policy. This will obviously be so when the insurance covers an immovable object, such as a house, or insures the honesty and fidelity of the employees at a particular place of business. . . .

*Id.* at Comment *b*. Because the parties are likely to have a common understanding of where the insured risk is located at the time of contracting in such cases,

> The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law *provided that the risk can be located, at least principally, in a single state*.

*Id.* at Comment *b* (emphasis added). However, not all policies cover single risks. Some, like the commercial general liability policy at issue in this case, provide coverage for all an insured's endeavors in whatever state they may occur. In such circumstances,

> the location of the risk has less significance, includ[ing] (1) where the insured object will be more or less constantly on the move from state to state during the term of the policy and (2) *where the policy covers a group of risks that are scattered throughout two or more states*.

*Id.* at Comment *b* (emphasis added). In other words, when a policy covers a particular risk located principally in one state, that state has the most significant contact. But where a policy covers risks in multiple states at the same time, the location of a single risk among many is not necessarily the most significant contact just because it is the only risk which gives rise to a lawsuit. *See Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d at 725 ("the location of the insured risk is given . . . less weight when the policy covers a group of risks scattered throughout two or more states").

      BCE argues that its position is supported by Comment *f* to Section 193, which provides

6

> A special problem is presented by multiple risk policies which insure
> against risks located in several states. A single policy may, for example,
> insure dwelling houses located in states X, Y and Z. . . . Presumably, the
> courts would be inclined to treat such a case, at least with respect to most
> issues, as if it involved three policies, each insuring an individual risk. So, if
> the house located in state X were damaged by fire, it is thought that the
> court would determine the rights and obligations of the parties under the
> policy, at least with respect to most issues, in accordance with the local law
> of X.

*Id.* at Comment *f*. BCE further cites *Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co.*, in which the Missouri Court of Appeals held that

> Comment f to § 193 discusses multiple risk policies which insure against
> risks located in different states, as is the case here, i.e. insurance policies
> cover Hyatt hotels located in some 28 states. The Restatement approach
> would treat each insured risk as though it were insured by a separate policy
> and would apply the law of the state where the risk was located. . . .
> Applying the law of the state in which the insured risk is located rather than
> that in which the contract was made is further warranted when there exists a
> possibility the court would have to apply the law of numerous states in
> interpreting over 20 contracts which insure the identical risk.

716 S.W.2d 348, 358-359 (Mo. Ct. App. 1986). Thus, argues BCE, the covered work in Kansas should be treated as being covered by a separate policy for which Kansas would have the most significant contact.

*Crown* involved 20 different insurance policies covering a collapsed bridge at the Crown Center in Kansas City, Missouri. The particular policy implicated in the choice-of-laws issue in that case covered Hyatt Hotels in 28 different states. Given the difficulty in construing 20 different policies under 20 different states' substantive laws, the Missouri Court of Appeals held that the trial court appropriately construed all policies under Missouri law. The fact-specific rationale behind *Crown* is not applicable to the

7

present case in which the policies provide general commercial liability to all of BCE's enterprises wherever they may be, rather than enumerated hotels in 28 specific states. In a case like *Crown*, Hyatt and its insurer could have anticipated subtle differences in state laws affecting each of its hotels since their locations were static and known at the time of contacting. The parties could therefore have crafted the policy language and exclusions in view of the laws of each state where Hyatt had a covered hotel.[3] By contrast, the commercial general liability policies at issue in the present case did not contemplate a set of enumerated construction job cites but rather were intended to cover BCE's commercial operations wherever they happened to occur, including projects yet to begin when the policies were delivered. Under such circumstances, the parties could not have anticipated which states' laws might eventually govern the disputes and would not have needed or been able to comply with separate "form" language required by any particular states. The logic of Comment *f* is therefore inapposite to the case at hand.

Since only 10-15 percent of BCE's business was conducted in Kansas at the time of contracting, it cannot be said that the "risk c[ould] be located, at least principally, in a

---

[3]For example, several of the policies at issue in *Crown* involved the Crown Center being named as an additional insured under Hyatt's insurance policy with regard to a specific hotel in Missouri. *Crown*, 716 S.W.2d at 351. Other district courts sitting in Missouri have distinguished the facts of *Crown* on this basis. *See, e.g., Arch Coal, Inc. v. Fed. Ins. Co.*, 2006 U.S. Dist. LEXIS 51061 (E.D. Mo. 2006) ("Comment f refers to a specific kind of multiple-risk policy sometimes employed when risks are spread across several states and those several states require different 'form' policy language such that the overall policy is actually made up of multiple state-specific policies which insure the risks in each particular state. There is no indication that this type of state-specific policy is applicable in this case, making the *Crown Center* case factually distinguishable.").

single state" or that it was "possible to predict with fair accuracy where the risk will be located, or at least principally located, during the life of the policy." Indeed, if Section 193 is applicable to the present case at all, it militates in favor of finding that Missouri law controls. Missouri is BCE's principal place of business. BCE negotiated for insurance with a Missouri insurance agent, and the policies were delivered to BCE in Missouri. Thus, Missouri is the only state "the parties [could have reasonably] understood . . . to be the principal location of the insured risk" given the facts before the Court. Moreover, "the location of the insured risk is given . . . less weight when the policy covers a group of risks scattered throughout two or more states." *Viacom,* 138 S.W.3d at 725. The Court is left with the balancing factors enumerated in Section 188, all of which tip heavily in favor of Missouri. The Court therefore concludes that Missouri law controls.

## III.   Coverage

In order to honor its contractual obligations to the Army Corps of Engineers, BCE had to repair the duct bank at Fort Riley, Kansas, which its subcontractors had failed to build to specifications. Plaintiffs seek a declaration that the cost of such repairs do not constitute an "accident" under the terms of BCE's policies. The St. Paul policy provides coverage for "amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that . . . is caused by an event." The policy further provides that "*Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Similarly, the Charter

9

Oak policy covers "'bodily injury' or 'property damage' . . . caused by an 'occurrence,'" and further defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Thus, under both policies, property damage is covered only if it is caused by an "accident." Since the term "accident" is not defined in either policy, the Court gives the word its plain meaning. *Haulers Ins. Co. v. Wyatt*, 170 S.W.3d 541, 545-546 (Mo. Ct. App. 2005) ("When interpreting an insurance policy, we give the language its plain meaning, which is the meaning that would ordinarily be understood by a layperson who bought the policy.") (internal quotations omitted).

The facts and policies at issue this case bear a marked resemblance to those in *American States Ins. Co. v. Mathis*, 974 S.W.2d 647 (Mo. Ct. App. 1998). In *Mathis*, an insurance company sought a declaration that it had no duty to indemnify its insured after the insured had to repair "improperly trenched and constructed duct banks and repair and replace electrical conduit, cable, and wire installed in the ducts by" the insured's subcontractors. *Id.* at 648. Much like BCE's policy, the policy at issue in *Mathis* was "a standard form commercial general liability policy which insures certain property damage caused by accident to the property of others." *Id.* at 649. Finding that "[i]t is not the function of the CGL [commercial general liability] policy to guarantee the technical competence and integrity of business management," the Missouri Court of Appeals held that a

> CGL policy does not serve as a performance bond[;] nor does it serve as a warranty of goods or services. It does not ordinarily contemplate coverage

> for losses which are a normal, frequent or predictable consequence of the
> business operations. Nor does it contemplate ordinary business expense, or
> injury and damage to others which results by intent or indifference.

*Id.* The *Mathis* court went on to explain that the term "accident" in ordinary usage means "[a]n event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event." *Id.* at 650 (citing *West v. Jacobs*, 790 S.W.2d 475, 477 (Mo. App. 1990); *Lindemann v. Gen. Am. Life Ins. Co.,* 485 S.W.2d 477, 479 (Mo. App. 1972)). "Under this definition breaches of contract are not 'accidents' or 'occurrences'" as those terms are used in commercial general liability policies. *Id.* Thus, the cause of the loss for which the insured sought coverage was

> [the insured's] failure to construct the ducts according to contract
> specifications. Such a breach of a defined contractual duty cannot fall
> within the term "accident." Performance of its contract according to the
> terms specified therein was within [the insured's] control and management
> and its failure to perform cannot be described as an undesigned or
> unexpected event.

*Id. See also Cincinnati Ins. Co. v. Venetian Terrazzo, Inc.*, 198 F. Supp. 2d 1074, 1079 (E.D. Mo. 2001) ("the term 'occurrence' in a commercial general liability policy, defined as an 'accident,' does not encompass the negligence or breach of contract in the insured's performance of its contract work"); *Hawkeye-Security Ins. Co. v. Davis*, 6 S.W.3d 419, 426 (Mo. Ct. App. 1999) (failure to build house as warranted was not "accident" or "occurrence").

The Army Corp of Engineers sent BCE a list of deficiencies in the construction of the duct bank and demanded that BCE correct them, which BCE promptly did. The only other damages identified by BCE as resulting from the negligent work of its

11

subcontractors was "the required reseeding of several acres of tall-grass prairie destroyed as a result of the required re-excavation of the duct bank and replacement of backfill," and that "several roadways were, or must be, destroyed and rebuilt as a direct result of the required rework."  BCE Ans., Ex 12 at 3.  These additional costs cannot be considered an accident or occurrence any more than the negligent work which necessitated them.  *Mathis*, 974 S.W.2d at 650 ("That the electrical conduit and cables had to be torn out and replaced when the duct banks were torn out and replaced was a normal, expected consequence of [the insured's] breach of contract and not an occurrence.")

Under *Mathis*, the substandard work performed by BCE's subcontractors does not constitute an occurrence under BCE's policies.  BCE offers no Missouri case law to distinguish *Mathis* from the facts of the present case or to otherwise respond to Plaintiffs' Motion for Summary Judgment and the Court has found none.  Indeed, all the arguments offered by BCE depend upon a finding that Kansas law controls, which the Court has already rejected.  "The burden of proving coverage is on the insured, despite the insured's denomination as defendant in a declaratory judgment action." *State Farm Mut. Auto. Ins. Co. v. Stockley*, 168 S.W.3d 598, 600 (Mo. Ct. App. 2005).  BCE has not met its burden to establish that its claimed losses are covered by its policies as construed under Missouri law.  Plaintiffs are therefore entitled to summary judgment on the declaratory relief they seek.

## IV.    Conclusion

Accordingly, it is hereby

12

ORDERED that Plaintiffs' Motion for Summary Judgment [Doc. # 38] is GRANTED. It is further

ORDERED that Defendant BCE's Cross-Motion for Partial Summary Judgment [Doc. # 48] is DENIED. It is further

ORDERED that Plaintiffs' Motion for Leave to File Surreply [Doc. # 59] is DENED as moot.

s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated:  April 19, 2007
Jefferson City, Missouri